1 | Timothy L. Reed, Bar No. 258034
treed@fordharrison.com
2 | FORD & HARRISON LLP
1901 Harrison Street, Suite 1650
3 | Oakland, CA 94612
Telephone: (415) 852-6910
4 | Facsimile: (415) 852-6925

5 | Jenny S. Choi, Bar No. 285839
jchoi@fordharrison.com
6 | FORD & HARRISON LLP
350 South Grand Avenue, Suite 2300
7 | Los Angeles, CA 90071
Telephone: (213) 237-2400
8 | Facsimile: (213) 237-2401

9 | Attorneys for Defendant
WALMART INC.
10

11 | UNITED STATES DISTRICT COURT

12 | NORTHERN DISTRICT OF CALIFORNIA

13

14 | BIJON HILL, an individual, | Case No. 4:19-cv-05436-JST

15 | Plaintiff, | [Assigned to the Hon. Jon S. Tigar]

16 | v. | **DECLARATION OF TIMOTHY L. REED
IN SUPPORT OF DEFENDANT'S**
17 | WALMART, INC., a Delaware | **MOTION FOR SUMMARY JUDGMENT**
corporation; and DOES 1-25, inclusive,
18 | | Date: January 13, 2021
Defendants. | Time: 2:00 p.m.
19 | | Ctrm.: 6

20 | | Action Filed: July 19, 2019
Date of Removal: August 29, 2019
21

22

23

24

25

26

27

28

Ford & Harrison
LLP
Attorneys At Law
San Francisco

WSACTIVELLP:11867119.1

1    I, Timothy L. Reed, declare as follows:

2        1.    I am over eighteen years of age, and have personal knowledge of each of the

3    matters set forth below and, if called as a witness, could and would testify competently to each

4    of them under oath.

5        2.    I am a partner in the law firm of Ford & Harrison LLP and am counsel of record

6    for Walmart Inc. ("Walmart") in this case.  This declaration is submitted in support of Walmart's

7    Motion for Summary Judgment.

8        3.    On October 14, 2020 and October 22, 2020, I took the deposition of plaintiff Bijon

9    Hill ("Plaintiff").  A true and correct copy of the relevant portions of the certified transcripts of

10   Plaintiff's Deposition are attached hereto as **Exhibit A**.

11

12       I declare under penalty of perjury under the laws of the United States of America and

13   the State of California that the foregoing is true and correct.

14       Executed this 13th day of November 2020, in Oakland, California.

15

16

17                                          */s/ Timothy L. Reed*

18                                          TIMOTHY L. REED

19

20

21

22

23

24

25

26

27

28

FORD & HARRISON
LLP
ATTORNEYS AT LAW
SAN FRANCISCO

WSACTIVELLP:11867119.1                    - 2 -                    DECLARATION OF TIMOTHY L. REED IN SUPPORT OF
                                                                   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
                                                                   4:19-CV-05436-JST



**EXHIBIT A**

2    NORTHERN DISTRICT OF CALIFORNIA

3    ---o0o---

4

5    BIJON HILL, an individual,

6          Plaintiff(s),

7        vs.    No. 4:19-cv-05436-JST

8    WALMART, INC., a Delaware
     corporation; and DOES 1-25,

9    inclusive,

10         Defendant(s).
     _____/

11

12

13        Videotaped Deposition of

14          BIJON C. HILL

15          Volume I

16       Wednesday, October 14, 2020

17

18

19

20   Reported by:
     SUSAN I. STUART, CSR No. 6410

21   Registered Professional Reporter
     Job No. SF 4283490

22

23

24

25

```
1    2016 have you been represented by any other talent

2    agencies?

3    A.       Yes.  Yes.

4    Q.       Okay.  What other agencies?

5    A.       Wilhelmina in Los Angeles.              10:24:04

6    Q.       Who else?

7    A.       The Rock Agency in Chicago.

8    Q.       Anyone else?

9    A.       No.

10   Q.       Okay.  What was your -- how would you   10:24:26

11   characterize your -- let me take a step back.

12            Were you -- were you represented by Scout at

13   any point?

14   A.       Yes.

15   Q.       Okay.  Is there any reason you didn't mention  10:24:37

16   Scout just now?

17   A.       Actually, we were on the same track.  I was

18   just about to say, of course, Scout.  That's why we're

19   here.

20   Q.       And for Wilhelmina when was the last time you  10:24:50

21   booked a job through them?

22   A.       I haven't.

23   Q.       Okay.  What about The Rock Agency?

24   A.       2019.

25   Q.       And how many jobs did you book through The Rock  10:25:17
```

Page 20

1    for that shoot, a W-2 or a 1099?

2    A.      I don't recall, but I'm sure I have something

3    on paper somewhere.

4    Q.      And do you know which one it was, was it a W-2,

5    was it a 1099?                                        10:27:39

6    A.      Not a W-2.

7    Q.      Okay.  Have you ever received a W-2 from any

8    agency for work you've done?

9    A.      No.

10   Q.      Apart from modeling, have you been engaged in    10:28:03

11   any other work since 2016?

12   A.      Yes.

13   Q.      What kind of work?

14   A.      Part-time waitressing.

15   Q.      And when did you perform part-time waitressing   10:28:21

16   work?

17   A.      2019.

18   Q.      Prior to that did you?

19   A.      Yes.  I don't recall the exact dates, but --

20   but, yes, I have here and there worked throughout my    10:28:44

21   life taking part-time waitressing jobs when I was

22   waiting to get paid from modeling jobs.

23   Q.      Okay.  So I'll ask again.  From 2016 to 2019 I

24   guess can you give me a time span during which you

25   performed part-time waitressing work?                   10:29:10

Page 22

1   communicated with any Walmart employees?

2   A.      No.

3   Q.      Okay.  When did you begin modeling for Walmart?

4   A.      I don't recall exactly, but if I had to

5   estimate I would say 2013.                          10:33:47

6   Q.      And who was your agent at the time?

7   A.      Scout in San Francisco.

8   Q.      How did you begin working through Scout?

9   A.      Sorry, could you rephrase the question?

10  Q.      Sure.  When did you start working through Scout  10:34:42

11  or when did Scout become one of your agencies?

12  A.      Exact dates I don't recall, but I would say if

13  I had to estimate between 2012, 2013.

14  Q.      And your first communication with Scout

15  regarding their potential representation, how was that  10:35:14

16  initiated?

17  A.      I was introduced to Scout through my previous

18  agency called Vision.

19  Q.      Who -- who from Vision introduced you to Scout?

20  A.      Megan Day, I believe.                          10:35:44

21  Q.      And did Miss Day introduce you to anyone

22  specific from Scout?

23  A.      Ryan Lippert, the CEO and founder.

24  Q.      Okay.  Was this an in-person introduction?

25  A.      Yes.                                           10:36:01

                                                        Page 25

1   was mentioned during this initial conversation?

2   A.      Yes.

3   Q.      Okay.  And then after -- after this initial

4   conversation, what happened next with respect to Scout's

5   representation of you?                              10:38:21

6   A.      I sent them photos.  They took digitals that

7   day during our meeting to have current photos to send

8   out to the different companies that they work with.  And

9   from there I started to receive e-mails about potential

10  bookings or jobs.                                   10:38:52

11  Q.      Did you enter into any agreement with Scout

12  concerning their representation of you?

13  A.      Yes.

14  Q.      Okay.  And what were -- what were the material

15  terms of that representation arrangement?            10:39:39

16  A.      I don't recall.  But it was a contract that was

17  signed between the two of us.

18  Q.      Did you ever submit an employment application

19  to Walmart?

20  A.      I -- no.                                     10:40:13

21  Q.      Did you ever sign any agreement with Walmart?

22  A.      Yes.

23  Q.      Okay.  What agreement?

24  A.      At the end of each shoot day I was given a

25  voucher or receipt which detailed how many hours I     10:40:34

```
1    worked that day, the amount that I was to be paid, and
2    some other information I don't recall exactly.  But it
3    was to be signed by me.  Walmart wanted me to sign it
4    each time that I came to do a photo shoot with them at
5    the end of the day.                              10:40:55
6    Q.        Were these -- were these talent vouchers, is
7    that what they were called?
8    A.        Yes.  But it was nothing that I was ever given
9    a copy of.  They -- it was -- I -- it was provided by
10   Walmart for Walmart is how I was -- how I perceived it    10:41:11
11   to be.  It was just a Walmart correspondence that they
12   wanted me to sign it seemed for their records.
13   Q.        Apart from these vouchers, did you ever sign
14   any other type of agreement with Walmart?
15   A.        No.                                       10:41:45
16   Q.        Prior to your -- well, strike that.
17             At any point did you ever have any job
18   interview with Walmart?
19   A.        I would not call it a job interview like
20   someone would normally have.  But, yes, in the modeling   10:42:09
21   world that's -- that's what a casting is.  When you show
22   up and -- Walmart asked to see me on a certain -- at a
23   certain time on a certain day at their photo studio, to
24   which I showed up to and I met with a producer.
25   Q.        You said that's called a casting; is that       10:42:41
```

Page 28

```
 1    A.      I don't believe so.

 2    Q.      So you had the casting and then after that you

 3    came back for actual booked shoots?

 4    A.      Correct.

 5    Q.      Apart from this casting with Wendy, prior to      10:48:05

 6    your first Walmart shoot did you ever communicate

 7    directly with anyone else from the company?

 8    A.      No.

 9    Q.      And after this casting, did Walmart somehow

10    confirm that they wanted to use you for modeling work    10:48:44

11    going forward?

12    A.      Yes.

13    Q.      Okay.  And was that done through Scout?

14    A.      It was an e-mail sent from the producer I

15    believe to Scout, who then let me know that they were    10:49:05

16    interested in whichever dates in the near future.

17    Q.      So they e-mailed Scout directly instead of you?

18    A.      Yes.

19    Q.      Did you ever receive any sort of letter or

20    other document indicating Walmart giving you a job       10:49:27

21    offer?

22    A.      No.

23    Q.      Did you ever complete any onboarding paperwork

24    with Walmart?

25    A.      You mean --                                       10:49:48
```

Veritext Legal Solutions
866 299-5127

```
 1    Q.        Go ahead.  I'm sorry.  I didn't mean to cut you

 2    off.

 3    A.        Well, there's definitely a size sheet.  They

 4    have to know my sizes, so I filled out my measurements,

 5    my sizes and what not.                              10:50:02

 6    Q.        Did you ever complete an I-9 with Walmart, for

 7    example, like an immigration document confirming that

 8    you can work in the United States?

 9    A.        No.

10    Q.        What about a W-9 or a W-4?                 10:50:25

11    A.        No.

12    Q.        Did you complete any health insurance or direct

13    deposit paperwork with Walmart?

14    A.        No.

15    Q.        Did you ever receive an employee handbook from  10:50:44

16    Walmart?

17    A.        No.  But I did receive -- but I was shown kind

18    of a pamphlet that they had put together of how they

19    wanted poses to be and things of that nature.

20    Q.        But you didn't receive an employee handbook    10:51:12

21    listing like the company's policies and what not --

22    A.        No.

23    Q.        -- for workers?

24              Did you ever receive any Walmart policies to

25    review or sign?                                     10:51:24
```

1    A.        No.

2    Q.        Did you undergo any sort of orientation or

3    training with Walmart?

4    A.        No.

5    Q.        Did you ever receive a performance evaluation        10:51:39

6    from Walmart?

7    A.        No.

8    Q.        Did you ever receive any discipline or

9    write-ups from Walmart, anything like that?

10   A.        No.                                                  10:52:04

11   Q.        The -- the shoots that are the subject of your

12   complaint against Walmart that you filed in court took

13   place from July 21st, 2016, to August 24th, 2017, I

14   believe.

15            Was Scout your talent agency with respect to          10:53:00

16   all of those shoots during that time frame?

17   A.        Yes.

18   Q.        Okay.  I think you mentioned you had an

19   agreement with Scout.

20            Do you still have a copy of that agreement in          10:53:15

21   your records?

22   A.        I -- I don't recall.  Perhaps.

23   Q.        Have you made any effort to look for any

24   records concerning your work for Scout?

25   A.        Yes.                                                  10:53:33

                                                      Page 34

```
1    Q.      What did you do to try to find records?

2    A.      I reached out to the accountant to send me a

3    full ledger of all the jobs that I had worked during the

4    time being with them.

5    Q.      Anything else?                           10:53:57

6    A.      Not that I can recall.

7    Q.      Okay.  Were you able to obtain that ledger?

8    A.      Yes.

9    Q.      Did you work with any particular agent at Scout

10   during this time frame when you were -- this 2016 to    10:54:15

11   2017 time frame when you were doing Walmart shoots?

12   A.      Yes.

13   Q.      What agent was that?

14   A.      There were two; Ryan Lippert and Jada Ogden.

15   Q.      Did they overlap or were they -- did they       10:54:37

16   represent you for specific time frames?

17   A.      They were both there the entire time that I was

18   there.

19   Q.      Okay.

20   A.      It's just whoever was available to, I don't      10:54:49

21   know, reach out.

22   Q.      For your Walmart assignments what type of --

23   how did you receive information for those assignments?

24   A.      Via e-mail.

25   Q.      And who would e-mail you the information?        10:55:15
```

Page 35

1   A.        Either Ryan or Jada.

2   Q.        Did anyone from Walmart ever e-mail you

3   directly?

4   A.        I -- I don't recall.  But if -- if it were, it

5   weren't that often.                              10:55:43

6   Q.        So you don't recall it happening?

7   A.        No.

8   Q.        What was your rate for Walmart modeling

9   services from July of 2016 to July of 2017?

10  A.        A standard day was $1,500, but sometimes they   10:56:09

11  would -- it could be more if I was doing intimates or

12  undergarments.

13  Q.        So it was a flat rate for the day depending on

14  what kind of work you were doing?

15  A.        Yes, typically.                         10:56:33

16  Q.        And that rate -- and that rate was typically

17  1,500 except when you were doing loungerie or

18  undergarment work?

19  A.        Yes.

20  Q.        How is that rate determined?             10:56:43

21  A.        I'm not exactly sure.  I would have to say from

22  Walmart.

23  Q.        When you say "not exactly sure," what do you

24  mean?

25  A.        I don't know for certain.               10:57:02

```
 1    Q.       Okay.  Did you negotiate that rate directly

 2    with Walmart?

 3    A.       No.

 4    Q.       Your -- did your agency tell you what the rate

 5    was for -- for the Walmart work?                          10:57:18

 6    A.       Yes.

 7    Q.       And there's this flat rate that you received.

 8             How was the fee to your agent handled?

 9    A.       Well, I -- we agreed upon a rate that they

10    would get, and they would take their percentage out and   10:57:58

11    then send me a check.

12    Q.       So was that percentage included in the 1,500 or

13    was it above and beyond that?

14    A.       I don't recall exactly, but either one or the

15    other.  It either was included in the 1,500 or it wasn't  10:58:29

16    and was on top of.

17    Q.       And is it your understanding that Walmart would

18    pay your agency, and then your agency would then pay you

19    minus the rate that it -- it was to receive?

20    A.       Sorry, could you repeat the question?           10:59:04

21    Q.       Sure.  Did Walmart pay you directly?

22    A.       No.

23    Q.       Okay.  Did your agency, Scout, pay you for your

24    Walmart modeling shoots?

25             MR. LOW:  Objection.  That calls for a legal     10:59:21
```

Veritext Legal Solutions
866 299-5127

```
 1    conclusion.  I mean you already know that Scout agency

 2    didn't pay her anything because they work for her.  So I

 3    don't understand the question.

 4    Q.        BY MR. REED:  Did Scout issue you a check for

 5    your Walmart work?                                    10:59:36

 6              I'm sorry, the audio broke up for a second.

 7    What did you say?

 8    A.        Yes.

 9    Q.        So for each job you performed for Walmart you

10    subsequently received a check from Scout?             10:59:59

11    A.        Yes.

12    Q.        Did you ever speak with anyone at Walmart

13    regarding transportation to or from photo shoots?

14    A.        No.

15    Q.        Did you ever speak to anyone at Walmart        11:00:27

16    regarding logistics and planning in advance of the photo

17    shoots?

18    A.        Sorry.  Vague.  What do you mean by

19    "logistics"?

20    Q.        I guess -- let me ask it a different way.     11:00:47

21              For the photo shoots that you did with Walmart,

22    prior to actually arriving at the studio did you ever

23    speak with anyone at Walmart about anything directly?

24    A.        No.

25    Q.        Okay.  Did anyone at Walmart ever communicate  11:01:07
```

Veritext Legal Solutions
866 299-5127

```
 1   with you directly regarding wardrobe or appearance

 2   requirements prior to shoots?

 3   A.       Prior, no.  But the day of the shoot, yes.  I

 4   mean --

 5   Q.       So while you were there that would happen?        11:01:39

 6   A.       Yes.

 7   Q.       But not prior to you arriving there?

 8   A.       No.

 9   Q.       Okay.  Were you free to decline any Walmart

10   assignments that you were offered?                        11:01:50

11   A.       "Assignments" meaning?

12   Q.       I'm sorry.  What's the best way to -- I didn't

13   mean assignments.

14   A.       Bookings?

15   Q.       Bookings, is that the best way to describe it?   11:02:04

16   Bookings, yes.

17   A.       Sorry, could you repeat it?

18   Q.       Sure.  Were you free to decline any bookings

19   from Walmart?

20   A.       Yes.                                             11:02:14

21   Q.       Or potential bookings.

22   A.       Yes.

23           MR. LOW:  While you're looking at your notes, I

24   just want to make you aware that it's roughly 11:03, so

25   it's roughly been about an hour.  So when you find a      11:02:47
```

```
1    they take place?

2    A.        At the Walmart photo studio in South

3    San Francisco, California.

4    Q.        And they all took place there?

5    A.        Yes.                                        11:12:53

6    Q.        And at the time you were living in Los Angeles?

7    A.        Yes.

8    Q.        So you would fly up for each shoot?

9    A.        Yes.

10   Q.        Were they same-day trips typically or        11:13:03

11   overnight?

12   A.        Sometimes I would be asked to work a couple

13   days, more than one day.  So sometimes, depending on the

14   booking dates, it could be more than one day.

15   Q.        Okay.  So if it was a shoot on a single day,  11:13:19

16   you would fly -- fly up and fly back down the same day,

17   but if it was multiple days then you would stay

18   overnight?

19   A.        Yes.

20   Q.        And for each of the shoots at issue from       11:13:37

21   July 21st, 2016, to August 24th, 2017, who was present?

22   A.        Oh, I don't recall each person's name.

23   Q.        Okay.  Do you recall their roles?

24   A.        A photographer, producer, a stylist.  That's

25   what I can remember so far.                            11:14:22
```

Veritext Legal Solutions
866 299-5127

```
 1              MR. LOW:  Well, that's up to Walmart.  She's

 2     not going to know that.

 3     Q.     BY MR. REED:  Do you know how the process

 4     worked?

 5     A.     No.                                        13:03:53

 6     Q.     Okay.  Did you ever invoice Walmart directly?

 7     A.     No.  I had an agreement with Scout, who I

 8     employed, that based on any bookings I would give them

 9     20 percent, to which had I known that I was supposed to

10     be paid the same day then I wouldn't have even had that  13:04:25

11     in place with Scout.  Walmart knew they were supposed to

12     pay me that day, I didn't.  So that's why Scout would on

13     my behalf.

14     Q.     Got it.

15            So Scout -- you never sent Walmart an invoice    13:04:38

16     directly?  That was my question.

17     A.     No.  But --

18            MR. LOW:  There's no question pending.

19            THE WITNESS:  Yeah, whatever.

20     Q.     BY MR. REED:  I'd like to introduce Exhibit 3    13:05:43

21     into evidence.

22            (Defendant's Exhibit 3 was

23            marked for identification.)

24     Q.     BY MR. REED:  Exhibit 3 is an e-mail chain,

25     Bates number P18 to P19.                               13:05:55
```

Page 58

```
 1    Miss Ogden and then in this e-mail right here Miss Ogden

 2    then sent these requirements to you?

 3    A.      Yes.  It looks like these are not Jada's words,

 4    these are words that Jada then sent to me.

 5    Q.      And again, Walmart never directly conveyed      13:22:26

 6    these requirements to you in any instance; is that

 7    correct?

 8    A.      Correct.

 9    Q.      And it all went through Scout; correct?

10    A.      It all?  I'm sorry, that's vague.  What does    13:22:46

11    "it all" mean?

12    Q.      Sure.  Anytime that Walmart had directions or

13    instructions for a photo shoot, Walmart never

14    communicated directly with you, instead the

15    communications went through Scout; is that correct?    13:22:59

16    A.      No.

17    Q.      Oh, okay.  In what instances did Walmart not

18    communicate through Scout?

19    A.      Well, when they were communicating to me

20    directly as soon as I arrived at the shoot.            13:23:11

21    Q.      Fair enough.

22            Prior to any shoot, so when you're not at the

23    location for any shoot, any direction or instruction

24    that Walmart had for you would be communicated to you

25    through Scout; is that correct?                        13:23:28
```

Veritext Legal Solutions
866 299-5127

```
 1    A.      Correct.

 2    Q.      Okay.  Looking at Exhibit 5.  All right,

 3    Miss Hill.  Exhibit 5 appears to be an e-mail exchange

 4    between you and Miss Ogden dated September 13th, 2016;

 5    is that correct?                                    13:24:28

 6    A.      Yes.

 7    Q.      Okay.  And in this e-mail Miss Ogden is asking

 8    if you are available for a shoot for Walmart on Tuesday,

 9    September 20th and Wednesday, September 21st; is that

10    right?                                              13:24:52

11    A.      No.

12    Q.      Okay.  So what's being asked then or what does

13    this e-mail convey?

14    A.      Nothing is being -- it looks again as though

15    this is a forwarded e-mail from Walmart confirming me,   13:25:01

16    telling Jada to confirm me, to which she then forwarded

17    to me.

18    Q.      Is it forwarded or cut and paste, can you tell

19    from this?

20    A.      It seems it was cut and paste, but it -- yeah.  13:25:16

21    Q.      So this is a -- an e-mail from Miss Ogden to

22    you; is that correct?

23    A.      Yes.

24    Q.      And Miss Ogden is seeking to confirm your

25    availability on September 20th and 21st; is that        13:25:43
```

Veritext Legal Solutions
866 299-5127

```
 1   Please be advised that I have read the foregoing

 2   deposition.  I state there are:

 3   (check one)

 4

 5   _____   NO CORRECTIONS

 6

 7   _____   CORRECTIONS ATTACHED

 8

 9   _____

10   BIJON C. HILL

11

12   _____

13   Date signed

14

15   Case Title:          HILL vs. WALMART

16   Date of Deposition:  October 14, 2020

17   Job No.:             SF 4283490

18

19

20                        ---o0o---

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1                REPORTER'S CERTIFICATE

 2

 3          I certify that the foregoing proceedings in the

 4   within-entitled cause were reported at the time and

 5   place therein named; that said proceedings were reported

 6   by me, a duly Certified Shorthand Reporter of the State

 7   of California, and were thereafter transcribed into

 8   typewriting.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties to said cause

11   of action, nor in any way interested in the outcome of

12   the cause named in said cause of action.

13          IN WITNESS WHEREOF, I have hereunto set my hand

14   this 20th day of October, 2020.

15

16

17

18          SUSAN I. STUART

             California CSR No. 6410, RPR

19

20

21

22

23

24

25

                                              Page 81
```

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                  ---o0o---

4

5   BIJON HILL, an individual,

6              Plaintiff(s),

7          vs.                    No. 4:19-cv-05436-JST

8   WALMART, INC., a Delaware

    corporation; and DOES 1-25,

9   inclusive,

10             Defendant(s).

    _____/

11

12

                   Videotaped Deposition of

13

                    BIJON C. HILL

14

                    Volume II

15

             Thursday, October 22, 2020

16

               (This transcript contains

17            Confidential exhibits and

               testimony pursuant to a

18               Protective Order)

19

20  Reported by:

    SUSAN I. STUART, CSR No. 6410

21  Registered Professional Reporter

    Job No. SF 4308278

22

23

24

25

Veritext Legal Solutions
866 299-5127

1    A.       Yes.

2    Q.       Okay.  Would -- would anyone else typically be

3    at the shoots?

4    A.       Yes.

5    Q.       Who else would be there?

6    A.       Other models, other producers, other

7    photographers and stylists as well.  I wouldn't always

8    be the only model that day.

9    Q.       But you said they would be in sort of -- you

10   need to be in your own separate area doing a separate

11   shoot?

12   A.       Yes, correct.

13   Q.       With your own team?

14   A.       Yes.

15   Q.       And who was responsible for doing makeup and

16   hair?

17   A.       I was, with the stipulations given by Walmart.

18   They told me how to show up, how to wear my hair, how to

19   wear my makeup, if it needed to be changed once I

20   arrived or at anytime during the shoot.

21   Q.       And you testified that the other individuals at

22   these shoots told you that they worked for Walmart; is

23   that correct?

24   A.       Can you specify "other individuals"?

25   Q.       Sure.  I believe that last week you testified

Veritext Legal Solutions
866 299-5127

1 that there were instances in which a producer or

2 producers would tell you that they worked for Walmart?

3 A.      Yes.

4 Q.      Okay.  Do you recall any specific dates or

5 individuals who told you this?

6 A.      I don't recall.

7 Q.      Okay.  What about the photographers, do you

8 recall any specific dates or individuals who told you

9 that they worked for Walmart?

10 A.      I don't recall dates, but I believe that I gave

11 you names of the photographers that I remembered.

12 Q.      Of the stylists do you recall any dates or

13 specific individuals?

14 A.      No to both.

15 Q.      So for the -- the shoots you did for Walmart in

16 South San Francisco, you would fly up from L.A.; is that

17 correct?

18 A.      Yes.  I would fly myself.

19 Q.      Okay.  When you say fly yourself, does that

20 mean you would book and pay for your own flight?

21 A.      Yes.

22 Q.      Okay.  Would you be reimbursed by anyone for

23 that flight?

24 A.      No.

25 Q.      And when you arrived, would you fly into

1  Q.      Okay.  Was it through a paper check, was it

2  through direct deposit?

3  A.      I mean I'm sure that it was through check, if

4  ever.

5  Q.      Do you know how many times you were reimbursed

6  for Ubers to the studio?

7  A.      No.

8  Q.      Do you recall what percentage of trips to the

9  studio you received reimbursements for?  And if you can

10  estimate, that's fine.

11  A.      No, I can't.

12  Q.      Okay.  And once you arrived at the studio, what

13  would happen?

14  A.      Once I arrived at the studio --

15  Q.      For each shoot.  Oh, let me -- let me take a

16  step back.

17          Were the days that you did these Walmart shoots

18  in South San Francisco, were they more or less the same

19  or did they vary as to how they would go?

20  A.      Ooh.  More or less the same.

21  Q.      Okay.  And --

22  A.      Sometimes different.

23  Q.      Sorry, I didn't mean to cut you off.

24  A.      No.  More or less the same, sometimes it would

25  be different.  I mean I was never shooting the same

1    piece of clothing, for instance.  You know what I mean?

2    Q.        Okay.  So the articles of clothing might

3    change --

4    A.        Yes.

5    Q.        -- is that right?

6    A.        Yes.

7    Q.        And, you know, your hairstyle might change, the

8    other members of the team might change --

9    A.        Correct.

10   Q.        -- is that right?

11             Is there anything else that would vary?

12   A.        No.  I think -- I think that's -- that's about

13   right.

14   Q.        So you would take an Uber to the studio.

15             And when you arrived at the studio, what's the

16   first thing that would happen?

17   A.        The first thing that would happen is I would

18   sign in and -- at the front.  They have like a reception

19   desk.

20   Q.        And the studio, is it like -- I'm trying to

21   imagine it.  Is it just you go into sort of -- is it

22   like at a business park or something or an office

23   building?

24   A.        I would describe it as kind of -- like almost

25   like a strip mall type area --

Veritext Legal Solutions
866 299-5127

1    Q.        Okay.

2    A.        -- with different businesses.  And Walmart had

3    their own photo studio in one of those buildings.

4    Q.        Okay.  And it was its own dedicated space so

5    Walmart wasn't sharing it with any -- anyone else?

6    A.        Correct.

7    Q.        And you would walk in you said and you would

8    sign in at the reception desk?

9    A.        Yes.

10   Q.        And what did that sign-in process entail?

11   A.        You mean writing down -- just writing down my

12   name, what time --

13   Q.        Yeah.

14   A.        -- I was there, what day it was.

15   Q.        Okay.  So you would write down your name, what

16   day it was?

17   A.        Yes.

18   Q.        And then what would happen next?

19   A.        Then I would be escorted into I'd say a

20   dressing room area, which is where they would, you know,

21   tell me -- hand me undergarments that they wanted me to

22   wear and tell me how much time I had to get dressed

23   before I needed to report on set.  Cover -- I was told

24   to cover up any tattoos that were visible.  Making sure

25   that my nails were the way that they wanted them to be

1    and just overall that my appearance was the way that

2    they wanted it to be before we started shooting.

3    Q.        Who would escort you back to the dressing room?

4    A.        The receptionist.  She was like a

5    receptionist/security person.

6    Q.        Do you happen to recall her name?

7    A.        I do not.  I don't.

8    Q.        And apart from the things you just told me, did

9    anything else happen during this time frame after you

10   were first taken back to the dressing room?

11   A.        Just pleasantries, hello's to people, that's

12   all.

13   Q.        And then you were given a time to report for

14   your session?

15             Is "session" the right word?

16   A.        Yeah.

17             Well, just -- just to -- a time to report on

18   set so that we could get started shooting.  They had a

19   very -- you know, they only had so many hours that they

20   wanted to shoot in between and they wanted, you know, so

21   much done during that time.  So timing and starting on

22   time was important to them.

23   Q.        And when you got to the set, what would happen

24   then?

25   A.        I would be given my first outfit or first look

1    to wear.  Or, no, I guess the very first thing we would

2    put -- I would put on what they call grays.  You just

3    put on just a gray like tank top and shorts.  And it's

4    so that they can take photos and get the lighting right

5    based on your skin tone and what not.

6    Q.    So after this initial part with you being

7    photographed in the grays, what would happen next?

8    A.    Then I would be given my first outfit or first

9    look for the day; shoes, jewelry, undergarments,

10   whatever the outfit was, dress, top, bottoms, swimsuits

11   sometimes.  Yeah.

12   Q.    Who would give you the outfits?

13   A.    I believe the stylist.

14   Q.    So after you were given your first look/outfit,

15   what would happen after that?

16   A.    Then we would begin shooting, meaning I would

17   do various poses.  Whichever poses that they wanted me

18   to have they would tell me specifically.  Stand -- which

19   way to stand, how to -- you know, where to place my

20   hands so I wasn't covering up whatever the main focal

21   point of the product was.  I would do front, side, back

22   shots, whatever they would tell me.  They would -- I was

23   being directed by the photographer.

24   Q.    So the photographer would be the person telling

25   you which poses to do?

1   A.      Yes, some -- most of the time.

2   Q.      Okay.  So you'd take these pictures with your

3   first look, and then what would happen?

4   A.      And then the same thing repeated until we broke

5   for lunch.  Just however many looks you could get done.

6   You'd have a whole rack that they wanted you to get done

7   that day.  So the name of the game was just however many

8   you could get done and then break for lunch.  Or they

9   would break us for lunch, they would tell us when we

10  could go to lunch.

11  Q.      Okay.  And who would be the person to decide

12  when it was time to break for lunch?

13  A.      The producer.

14  Q.      Would the producer be -- and you touched on

15  this, but I just want to confirm.  Would the producer be

16  just sort of dedicated to your shoot or was the producer

17  moving in and out of other shoots as well?

18  A.      It was to my knowledge that they were kind of

19  floating around.

20  Q.      And when you broke for lunch, how long was that

21  typically?

22  A.      I don't remember exactly, but between

23  30 minutes, an hour.

24  Q.      And who would decide when the lunch break was

25  over?

1    A.       Also the producer.

2    Q.       Would you know in advance how long the lunch

3    break would be or would the producer come in and just

4    say, "Hey, guys, let's get back to it"?

5    A.       Yeah.  I mean it was -- it was typically the

6    same.  You know, some days it would run over, but -- and

7    we'd be, you know, kind of rushed in to kind of go and

8    get started again after lunch.

9    Q.       And then after lunch what would happen?

10   A.       We would start shooting again.

11   Q.       Then would the process be you continuing to go

12   through different looks?

13   A.       Yes.

14   Q.       And how would the day end for these shoots?

15   A.       Typically at a certain time.

16   Q.       Would you know the time in advance?

17   A.       Yes.  It was -- it was pretty much the same

18   every shoot.

19   Q.       What time was that?

20   A.       I believe 4:30 p.m.

21   Q.       What time would you start usually?

22   A.       I believe 8:00 a.m.

23   Q.       Would there be instances where you didn't get

24   through the entire rack but the day would end

25   nevertheless?

1    A.       Not that I can remember.

2    Q.       Were there ever any occasions where you got

3    through the rack early and you were able to leave early?

4    A.       Not that I can remember.

5    Q.       After the shoot ended, what would happen next?

6    A.       After the shoot ended, I would, you know,

7    change back into my clothes, hand them back their

8    clothes, or whatever they asked me, you know, to wear

9    that day, and then I would go into the producer's office

10   to where I would sign a voucher that she had, you know,

11   drawn up or typed up.

12   Q.       You would sign the voucher and then what would

13   happen after that?

14   A.       And then I would typically just call my Uber

15   back to either the airport or to the hotel if I was

16   shooting more than one day.

17   Q.       Going back to the airport did you seek

18   reimbursement in the same way you previously described

19   for your trips from the airport to the studio?

20   A.       Well, yes.  I would, you know -- it would only

21   make sense to get reimbursed for both rides versus one.

22   Q.       And what about instances where you stayed

23   overnight, would you get reimbursed or seek

24   reimbursement for your Uber from the studio back to your

25   hotel?

1    A.       Yes.  If I could, yes.

2    Q.       When you say if you could, what do you mean by

3    that?

4    A.       Sorry, I didn't mean if I could.  But, yes, I

5    would.

6    Q.       Where did you stay when you had the photo

7    shoots in South San Francisco on occasions where you

8    needed to stay overnight?

9    A.       It varied.  Sometimes a hotel, friends.

10   Q.       When you stayed at hotels, would you book the

11   hotels yourself?

12   A.       Yes.

13   Q.       Okay.  And were you -- were you reimbursed by

14   anyone for the hotels?

15   A.       No.

16   Q.       Did you ever request reimbursement from anyone

17   for the hotels?

18   A.       No.  I didn't receive reimbursement for flights

19   or for hotels.  So I was, you know, merely trying to

20   work and make money.  So I would come out of pocket

21   waiting to be paid back.  So when they would take

22   30-plus, 90 days, I still was out of pocket all that

23   money that entire time, even though they had been using

24   my images right after the shoot almost always.

25   Q.       Got it.  So the answer to the question is that

Page 103

1    Q.       Okay.  The ten dates at issue from July 16th --

2    I'm sorry, from July 2016 to August 2017 we've talked

3    about variation and sort of the team that was involved

4    and the clothing you wore.

5            But apart from that, do you remember any

6    specific ways in which the day unfolded differently than

7    what you described?

8    A.       I mean some days I was asked to shoot lingerie,

9    so that would probably be the only difference.

10   Q.       When the -- when shoots concluded, would the

11   photographer let the producer know or was there another

12   way in which it was decided that the day was going to

13   end?

14   A.       No.  Like I said previously, there was

15   typically a time -- an end time that everyone knew

16   about.

17   Q.       Apart from deciding when to start the day, when

18   to break for lunch, when to come back, when to end the

19   day, did the producer have any other involvement in the

20   shoot?

21   A.       I mean the producer was the main overseer, so

22   she would float around.  And if she saw something she

23   wanted changed, if she wanted me to do a different pose,

24   she would tell me.  If she wanted me to change my hair,

25   she would tell me.  If she wanted me to change my

1   record 10:40 a.m.

2                        (Break taken.)

3           THE VIDEOGRAPHER:  Okay.  We're back on the

4   record at 11:45 a.m.

5           MR. REED:  The parties are working with

6   Veritext to resolve an issue with Exhibit Share,

7   specifically giving Miss Schabloski access to the

8   platform.  We've agreed to take a break until 12:30, and

9   we will come back on the record at that time.  That's

10  it.

11          THE VIDEOGRAPHER:  Okay.  We are off the record

12  at 11:46 a.m.

13                     (Lunch break taken.)

14          THE VIDEOGRAPHER:  We are back on the record at

15  12:34 p.m.

16  Q.      BY MR. REED:  Miss Hill, do you understand that

17  you are still under oath?

18  A.      Yes.

19  Q.      In between the shoots that you did for Walmart

20  in South San Francisco, did you have any discussions or

21  communications with any producer or anyone else from

22  Walmart?

23  A.      No.

24  Q.      I would like to introduce Exhibit 10 into

25  evidence.  Exhibit 10 is an e-mail, Bates number P3,

                                            Page 107

1    A.       Yes.

2    Q.       Okay.  And is this an e-mail from Miss Ogden to

3    you that was sent on August 16th, 2017?

4    A.       Yes.

5    Q.       It looks like this e-mail is confirming your

6    availability for a Walmart shoot on August 24th, 2017;

7    is that correct?

8    A.       Yes.

9    Q.       Okay.  Did this shoot, in fact, go forward?

10   A.       Yes, I believe.

11   Q.       I'd like to introduce -- pardon me.  I would

12   like to introduce Exhibit 12 into the record.

13   Exhibit 12 is an exhibit consisting of ten separate

14   documents, each with the heading "Talent Voucher."

15           (Defendant's Exhibit 12 was

16           marked for identification.)

17           MR. REED:  For the record, I would like to

18   designate these documents confidential pursuant to any

19   protective order that is in effect or may go into effect

20   in this case.

21   Q.       BY MR. REED:  Miss Hill, I'm going to ask --

22   I'm going to ask you about each of these individually,

23   but I'm going to ask that you flip through them quickly

24   and then I'll start asking my questions.  Let me know

25   when you're ready.

1          MS. SCHABLOSKI: Take your time.

2    Q.     BY MR. REED: Sorry. Yes. I'm going to ask

3    that you flip through them and let me know when you're

4    ready.

5          MS. SCHABLOSKI: While Bijon is looking through

6    them, I'll just put on the record before the deposition

7    started Tim and I had a discussion about -- I believe it

8    was this particular exhibit -- about it being marked

9    confidential. We do have a preliminary agreement that

10   the Exhibit 12 Talent Vouchers can be marked

11   confidential subject to a protective order, but that

12   does not preclude any later arguments or discussion

13   about whether or not they're properly confidential

14   documents.

15        MR. REED: Agreed.

16        THE WITNESS: Okay. I just looked over all of

17   them.

18    Q.     BY MR. REED: Miss Hill, are these the Talent

19   Vouchers we've discussed during your deposition last

20   week and today?

21    A.     Yes.

22    Q.     It appears that these are the vouchers that

23   pertain to the ten specific shoots that are at issue in

24   this case; is that correct?

25    A.     Yes.

1    Q.        Starting with the first one, if you look at the

2    bottom where -- under "Model or Model's Legal Guardian"

3    there's a signature there.

4              Is that your signature?

5    A.        Yes.

6    Q.        Okay.  And if you look at job date, it appears

7    that this Talent Voucher is for the July 21st, 2016,

8    shoot; is that correct?

9    A.        Yes.

10   Q.        Okay.  And in looking at the chart where it

11   shows time in, time out, total hours, rate, and total,

12   based on this document it appears that the shoot that

13   day went for eight hours; is that right?

14   A.        Yes.

15   Q.        And you were to be paid $1,500 for this

16   particular shoot; is that right?

17   A.        Yes.

18   Q.        And if you go down below, it says subtotal

19   1,500 and then there's an agency fee for $300.

20             Is that the 20 percent agency fee that we've

21   discussed previously?

22   A.        No, it's not.

23   Q.        What is that $300 agency fee?

24   A.        So companies have to pay their own agency fee

25   to the agents outside of -- which has nothing to do with

1   understanding that that was the total fee that Walmart

2   was to pay to Scout?

3   A.      To Scout and to myself.

4   Q.      But directly to Scout; correct?

5   A.      Well, the only reason that they were paying

6   directly to Scout is because at the time I wasn't aware

7   that they were supposed to be paying me directly at the

8   end of the day.  They were the only ones that knew that,

9   not me.

10  Q.      Okay.  But you don't dispute that the money

11  went directly to Scout and then Scout paid it to you?

12  A.      The money went to Scout because I wasn't aware

13  of the laws, that the money should go to me directly at

14  the end of the shoot, yes.

15  Q.      And were you actually paid for the shoot?

16  A.      I mean not in a timely manner.  But, yes, I was

17  eventually.

18  Q.      Okay.  When were you paid?

19  A.      I don't recall, but well over 30 days after the

20  shoot.

21  Q.      And if you look -- look down, it says

22  "Wal-Mart.com USA, LLC."  And then there's the name

23  Tracy Gin, and then it says "Photography Producer."

24          Would that have been the photography producer

25  that was on set that day?

```
1              And per this language, was it your
2    understanding that you would be -- you were agreeing
3    that you would be paid within 30 days of when Scout
4    invoiced Walmart for a particular shoot?
5              MS. SCHABLOSKI:  Objection to the extent it
6    calls for a legal conclusion.  Vague and ambiguous.
7              You can answer.
8              THE WITNESS:  Could you ask the question again?
9    Q.         BY MR. REED:  Sure.  So this paragraph that
10   ends with "I agree" -- I'm sorry, begins with "I agree"
11   and ends with "unless otherwise negotiated by agency"
12   states that all payments are due in 30 days from date of
13   invoice.
14             As far as invoicing, was it your understanding
15   that Scout would invoice Walmart for each shoot based on
16   this Talent Voucher?
17   A.         Well, at the time I was not aware that I was
18   supposed to be paid the day of.  So, yes, at the time
19   that was my understanding.  But Walmart knew that they
20   were supposed to pay me the day of, so it's --
21   Q.         What do you base that on?
22   A.         -- interesting that --
23             Because they knew the law.  They're a large
24   corporation.  Of course they would know versus me.
25   Q.         Anything else?
```

Veritext Legal Solutions
866 299-5127

1   understanding was at the time.  Your understanding is

2   relevant to sort of the parties' interpretation of this

3   relationship and how it was to work.

4          So what I'm asking you is, at the time you

5   signed these documents -- and I appreciate your legal

6   position, and we're all going to have a chance to argue

7   our legal positions.

8          But what I'm asking you factually is, at the

9   time you signed these vouchers, was it -- was it your

10  understanding that Walmart would -- I'm sorry, Scout

11  would invoice Walmart for each shoot, was that your

12  understanding?

13  A.      It was my ignorant understanding, yes.  Because

14  I wasn't fully aware of the law at the time, no one told

15  me.

16  Q.      And then was it also your understanding that

17  based on this document Scout was then to pay you your

18  fee within 30 days?

19          MS. SCHABLOSKI:  Objection.  May be

20  argumentative as phrased and may call for a legal

21  conclusion.  And I think it assumes facts.

22          But if you understand, go ahead.

23          THE WITNESS:  No, I don't understand.

24  Q.      BY MR. REED:  Okay.  So you don't understand

25  whether or not based on this document Walmart was

1          I'll ask it this way.  For the 2017 shoots at

2   issue, were you paid for all of those shoots?

3   A.        Eventually, yes.

4   Q.        Okay.  Do you know when you were paid

5   specifically for any of them?

6   A.        Specifically, I don't.

7   Q.        You don't know off the top of your head, but

8   you could look at that ledger and that would reflect the

9   date of payment; is that fair to say?

10  A.        I -- I mean I could give a guesstimate.

11  Q.        Sure.  Let's do -- for -- you could give a

12  guesstimate for all of them or just the 2000 --

13  A.        Yeah.  I mean for -- I'm pretty sure for all of

14  them it was well over 30 days that I finally received

15  payment.

16  Q.        Okay.  And apart from these vouchers, did you

17  ever sign anything else with Walmart?

18  A.        Not that I recall, no.

19  Q.        Did you ever complain to Scout that you weren't

20  paid on time for any Walmart shoots?

21  A.        Yes.

22  Q.        Which shoots did you complain about?

23  A.        Specifically I'm not sure, but I -- I

24  definitely remember complaining about it on numerous

25  occasions.

1    A.         Pretty much every time that I reached out and

2    asked about it that was the response I was given, that

3    they continuously told Walmart that they were supposed

4    to be paying me, you know, the day of the shoot.

5    Q.         When you reached out to Scout, would it be by

6    phone or by e-mail?

7    A.         Sometimes both.

8    Q.         Did you ever bring your concerns directly to

9    Walmart regarding status of payment?

10   A.         Not that I recall.

11   Q.         Did you ever ask Walmart to pay you directly?

12   A.         Not that I recall.

13   Q.         And when you were at any of the shoots, did you

14   ever bring it to the producer's attention that Walmart

15   wasn't paying you on time and that you believed it to be

16   a concern?

17   A.         No.  Because, you know, to my knowledge, Scout

18   was talking to them and trying to get them to pay me

19   earlier and on time.

20   Q.         Okay.  In addition to these shoots you did for

21   Walmart between July 2016 and August 2017, did you

22   participate in any other shoots for any other companies

23   through Scout?

24   A.         Yes.

25   Q.         Okay.  And were you paid by Scout directly for

Page 142

1    Q.        I'm sorry.  It was an either/or.  I'm sorry.

2              Did Stitch Fix issue you a W-2 at the end of

3    the year?

4    A.        Not that I can recall.

5    Q.        Did you receive a 1099 at the end of the year?

6    A.        Not that I can recall.

7    Q.        Did you receive any sort of tax document from

8    Stitch Fix reflecting them paying you directly?

9    A.        Not that I can recall, no.

10   Q.        Okay.  So during this 2017 -- I'm sorry,

11   2016/2017 time frame, you were doing photo shoots for

12   Walmart and Stitch Fix through Scout.

13             Do you recall any other companies you were

14   doing shoots for through Scout?

15   A.        I don't recall all of them but, yes, there

16   were -- there were others.

17   Q.        Do you recall some of them?

18   A.        Old Navy.

19             MS. SCHABLOSKI:  Can I just clarify?  Is this

20   the 2016/2017 period --

21             MR. REED:  Yes.

22             MS. SCHABLOSKI:  -- you're asking about?  Okay.

23   Q.        BY MR. REED:  Old Navy.

24             Anyone else?

25   A.        Old Navy.  Perhaps Le Tote.  Gap.  Besides that

1    I don't remember too much more, but I'm sure there were

2    more.

3    Q.        And for all of those companies you received

4    payment from Scout as opposed to being paid directly by

5    the companies; is that right?

6    A.        Yes.   I had Scout accept the money on my behalf

7    because I wasn't aware that I was supposed to be getting

8    paid the same day.

9    Q.        So Scout would -- the companies would give

10   money to Scout and then Scout would issue a check?

11   A.        Yes.

12   Q.        And I think I asked you this last time, but I

13   want to see if you remember.

14            Did Scout issue you 1099's at the end of 2016

15   and at the end of 2017 for the modeling work you did

16   through them?

17   A.        I don't recall.

18   Q.        Would that information be reflected in your tax

19   documents for those years?

20   A.        I -- I also don't recall.  I don't, sorry,

21   remember all of the different tax years.

22   Q.        Apart from Stitch Fix, during this 2016/2017

23   time frame did you ever receive direct payment for any

24   non-Scout modeling clients?

25   A.        Not that I recall.  Well, I'm sure some -- some

1  Q.      We talked earlier about how you would get re --

2  Uber reimbursements from Walmart.

3          Did you ever seek any other reimbursements from

4  Walmart for expenses related to photo shoots?

5  A.      No.

6  Q.      Did you ever seek any reimbursement from Scout

7  for any expenses related to photo shoots for Walmart?

8  A.      No.

9  Q.      Did you make any tax deductions for expenses

10 associated with the photo shoots?

11 A.      Yes.

12 Q.      And what types of expenses did you deduct?

13 A.      Flights.  Hotels if I needed them.

14 Q.      Anything else?

15 A.      Sometimes food, I don't know, in between

16 flights or something like that or if I had to stay

17 overnight.

18 Q.      What about makeup or any other beauty products?

19 A.      Yes.

20 Q.      What about hair care?

21 A.      Yes.

22 Q.      Anything else?

23 A.      Sometimes mileage if I drove myself to the

24 airport from L.A. or something like that.

25 Q.      And for modeling generally did you ever make

1  any deductions for expenses related to that overall

2  endeavor?

3          MS. SCHABLOSKI:  Objection.  Vague and

4  ambiguous.

5          THE WITNESS:  Yeah, I don't -- I -- you were

6  just asking me for Walmart and now you're asking me just

7  in general?

8  Q.      BY MR. REED:  Yeah.  Like, you know, headshots,

9  gym memberships, things that apply to your making a

10 living as a model generally, not just Walmart

11 specifically.

12 A.      Yes.  Yes.

13 Q.      Okay.  What kind of things did you deduct

14 for that are related to your general modeling career?

15 A.      I mean pretty much anything related to the

16 upkeep of my appearance.

17 Q.      What does that include?

18 A.      Everything we've mentioned already; hair,

19 makeup, nails, gym.

20 Q.      Anything like nutrition-related?

21 A.      Not generally.

22 Q.      Okay.  And to be clear, these are the types

23 of -- these deductions, you were making them in 2016 and

24 2017; is that correct?

25 A.      I believe so.

Page 149

1  Q.      And 2018 for work done in 2017; is that right?

2  A.      I believe so, yes.

3  Q.      With respect to Scout, did you ever issue that

4  company any paychecks?

5  A.      Not that I recall.

6  Q.      Did you ever issue Scout any W-2's or Form

7  1099's?

8  A.      No.

9  Q.      Do you know generally how many clients you

10 provided modeling services for in 2016?

11 A.      I don't.

12 Q.      Do you have an estimate?

13 A.      If I had to estimate, I don't know, between

14 five and 15 companies.

15 Q.      What about 2017?

16 A.      The same.

17 Q.      What about 2018?

18 A.      The same.

19 Q.      Since you filed this lawsuit in July 2019, have

20 you been paid directly by any clients for any shoots?

21 A.      No.

22 Q.      Have you asked any clients for direct payment?

23 A.      No.

24 Q.      Is there any particular reason -- particular

25 reason why you have not?

1          When is the last time you participated in any

2     training like that?

3     A.        I'm not exactly sure, but if I had to guess I

4     probably did my training between 2013 and 2018.

5     Q.        Got it.

6               I believe that I've introduced Exhibit 15 into

7     the record, but I will say again Exhibit 15 is a

8     document called Plaintiff's Responses to Defendant's

9     Request for Admissions, Set One.  Let me know when you

10    are -- when the document is loaded and you're ready to

11    talk about it.

12    A.        I have it.

13    Q.        Okay.  Would you mind once again turning to

14    that final page?

15    A.        Yes.

16    Q.        And is that your signature at the bottom of

17    that final page where it says "Verification"?

18    A.        It's still loading.

19    Q.        Oh, sorry.

20    A.        Yes, that's my signature.

21    Q.        Miss Hill, I'm going to ask you to turn to page

22    four.  And for Request for Admission No. 1 you were

23    asked to admit that all relevant times, relevant times

24    meaning January 1st, 2016, to December 31st, 2017, there

25    was no agreement between you and Walmart, for the

1    purposes of these requests Walmart means Defendant

2    Walmart, Inc.  And then you go on to deny that there was

3    an agreement between you and Walmart.

4            I just want to confirm based on your testimony

5    last week the agreement that you're referring to is

6    the -- are the Talent Vouchers that we discussed earlier

7    today; is that right?

8    A.       Yes, I believe so.

9    Q.       Okay.  And the request for admission asks that

10   you admit that you never communicated directly with

11   Walmart regarding the details of any photo shoot.  And

12   then you deny communicating with Walmart regarding

13   details of any photo shoots.

14           Apart from communication that happened at the

15   photo shoots, did you have any direct communications

16   with Walmart concerning the details of the photo shoots?

17   A.       Outside of shoot days, no.

18   Q.       And on page six Request for Admission No. 8

19   asks that you admit at all relevant times you were free

20   from control and direction of Walmart in connection with

21   the performance of your modeling services.  And you deny

22   that request.

23           My question is, how did Walmart control you in

24   connection with the performance of your modeling

25   services?

1  Please be advised that I have read the foregoing

2  deposition.  I state there are:

3  (check one)

4

5  _____  NO CORRECTIONS

6

7  _____  CORRECTIONS ATTACHED

8

9  _____

10  BIJON C. HILL

11

12  _____

13  Date signed

14

15  Case Title:          HILL vs. WALMART

16  Date of Deposition:  October 22, 2020

17  Job No.:             SF 4308278

18

19

20                      ---o0o---

21

22

23

24

25

Page 171

1      REPORTER'S CERTIFICATE

2

3          I certify that the foregoing proceedings in the

4    within-entitled cause were reported at the time and

5    place therein named; that said proceedings were reported

6    by me, a duly Certified Shorthand Reporter of the State

7    of California, and were thereafter transcribed into

8    typewriting.

9          I further certify that I am not of counsel or

10   attorney for either or any of the parties to said cause

11   of action, nor in any way interested in the outcome of

12   the cause named in said cause of action.

13         IN WITNESS WHEREOF, I have hereunto set my hand

14   this 24th day of October, 2020.

15

16

17

18   SUSAN I. STUART

     California CSR No. 6410, RPR

19

20

21

22

23

24

25

Page 172

## **PROOF OF SERVICE**

I, Mary Garner, declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071. On November 13, 2020, I served a copy of the within document(s):

**DECLARATION OF TIMOTHY L. REED IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

☒ ELECTRONICALLY: I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System. I served those parties who are not registered participants of the ECF System as indicated below.

☒ by e-mail or electronic transmission. Based on an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent on the date shown below to the e-mail addresses of the persons listed below. My e-mail address is mgarner@fordharrison.com. I did not receive within a reasonable time after the transmission any electronic message or other indication that the transmission was unsuccessful.

| | |
|---|---|
| Joseph H. Low IV | Attorneys for Plaintiff |
| The Law Firm of Joseph H. Low IV | |
| 100 Oceangate, 12th Floor | |
| Long Beach, CA 90802 | |
| Telephone: (562) 901-0840 | |
| Facsimile: (562) 901-0841 | |
| joseph@jhllaw.com | |
| megant@jhllaw.com | |
| | |
| Roger Y. Muse | Attorneys for Plaintiff |
| John R. Matheny | |
| Alyssa Schabloski | |
| Excelsior Law | |
| 9595 Wilshire Boulevard, Suite 900 | |
| Beverly Hills, CA 90212 | |
| Telephone: (310) 205-3981 | |
| Facsimile: (310) 205-0594 | |
| roger@excelsior-law.com | |
| john@excelsior-law.com | |
| alyssa@excelsior-law.com | |

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on November 13, 2020, at Los Angeles, California.

*Mary Garner*

_____
Mary Garner

FORD & HARRISON
LLP
ATTORNEYS AT LAW
SAN FRANCISCO

WSACTIVELLP:11867119.1

DECLARATION OF TIMOTHY L. REED IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
4:19-CV-05436-JST