JOSEPH H. LOW IV (SBN 194897)
joseph@jhllaw.com
THE LAW FIRM OF JOSEPH H. LOW IV
100 Oceangate, 12th Floor
Long Beach, CA 90802
Telephone: (562) 901-0840
Facsimile: (562) 901-0841

ROGER Y. MUSE (SBN 147120)
roger@excelsior-law.com
JOHN R. MATHENY (SBN 149532)
john@excelsior-law.com
EXCELSIOR LAW
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Telephone: (310) 205-3981
Facsimile: (310) 205-0594

Attorneys for Plaintiff
BIJON HILL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIJON HILL, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>WALMART, INC., a Delaware corporation; and DOES 1-25, inclusive,<br><br>Defendants. | CASE NO. 4:19-cv-05436-JST<br>[Assigned to the Hon. Jon S. Tigar]<br><br>**DECLARATION OF JOSEPH H. LOW IV IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; EXHIBIT 1**<br><br>*Filed Concurrently with:*<br>-*Points and Authorities in Opposition*<br><br>Date: January 13, 2021<br>Time: 2:00 p.m.<br>Dept: 6<br><br>Action Filed: July 19, 2019<br>Date of Removal: August 29, 2019 |

I, Joseph H. Low IV, declare and say as follows:

1. I am counsel of record for plaintiff, Bijon Hill ("Plaintiff") in the within action. I have personal knowledge of the facts set forth in this declaration and, if called upon, could and would competently testify thereto, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

2. On October 14, 2020 and October 22, 2020, counsel for defendant, Walmart, Inc., took the deposition of Plaintiff. A true and correct copy of the relevant portions of the certified transcripts of Plaintiff's Deposition is attached hereto as Exhibit 1.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct. Executed this 25th day of November 2020, at Long Beach, California.

JOSEPH H. LOW IV

EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---o0o---

BIJON HILL, an individual,

Plaintiff(s),

vs. No. 4:19-cv-05436-JST

WALMART, INC., a Delaware corporation; and DOES 1-25, inclusive,

Defendant(s).

______________________________/

Videotaped Deposition of

BIJON C. HILL

Volume I

Wednesday, October 14, 2020

Reported by:

SUSAN I. STUART, CSR No. 6410

Registered Professional Reporter

Job No. SF 4283490

APPEARANCES

(Remotely by Veritext Zoom)

For the Plaintiff:

LAW FIRM OF JOSEPH H. LOW, IV
By: JOSEPH H. LOW, IV, ESQ.
100 Oceangate, 12th Floor
Long Beach, California 90802
562.901.0840
Joseph@JHLlaw.com

For the Defendant:

FORD & HARRISON, LLP
By: TIMOTHY L. REED, ESQ.
1901 Harrison Street, Suite 1650
Oakland, California 94612
415.852.6910
TReed@FordHarrison.com

Also Present:

DANIEL BRUUN, videographer

Q. Go ahead. I'm sorry. I didn't mean to cut you off.

A. Well, there's definitely a size sheet. They have to know my sizes, so I filled out my measurements, my sizes and what not. 10:50:02

Q. Did you ever complete an I-9 with Walmart, for example, like an immigration document confirming that you can work in the United States?

A. No.

Q. What about a W-9 or a W-4? 10:50:25

A. No.

Q. Did you complete any health insurance or direct deposit paperwork with Walmart?

A. No.

Q. Did you ever receive an employee handbook from Walmart? 10:50:44

A. No. But I did receive -- but I was shown kind of a pamphlet that they had put together of how they wanted poses to be and things of that nature.

Q. But you didn't receive an employee handbook listing like the company's policies and what not -- 10:51:12

A. No.

Q. -- for workers?

Did you ever receive any Walmart policies to review or sign? 10:51:24

Q. What did you do to try to find records?
A. I reached out to the accountant to send me a full ledger of all the jobs that I had worked during the time being with them.
Q. Anything else? 10:53:57
A. Not that I can recall.
Q. Okay. Were you able to obtain that ledger?
A. Yes.
Q. Did you work with any particular agent at Scout during this time frame when you were -- this 2016 to 10:54:15 2017 time frame when you were doing Walmart shoots?
A. Yes.
Q. What agent was that?
A. There were two; Ryan Lippert and Jada Ogden.
Q. Did they overlap or were they -- did they 10:54:37 represent you for specific time frames?
A. They were both there the entire time that I was there.
Q. Okay.
A. It's just whoever was available to, I don't 10:54:49 know, reach out.
Q. For your Walmart assignments what type of -- how did you receive information for those assignments?
A. Via e-mail.
Q. And who would e-mail you the information? 10:55:15

A. Either Ryan or Jada.

Q. Did anyone from Walmart ever e-mail you directly?

A. I -- I don't recall. But if -- if it were, it weren't that often. 10:55:43

Q. So you don't recall it happening?

A. No.

Q. What was your rate for Walmart modeling services from July of 2016 to July of 2017?

A. A standard day was $1,500, but sometimes they would -- it could be more if I was doing intimates or undergarments. 10:56:09

Q. So it was a flat rate for the day depending on what kind of work you were doing?

A. Yes, typically. 10:56:33

Q. And that rate -- and that rate was typically 1,500 except when you were doing loungerie or undergarment work?

A. Yes.

Q. How is that rate determined? 10:56:43

A. I'm not exactly sure. I would have to say from Walmart.

Q. When you say "not exactly sure," what do you mean?

A. I don't know for certain. 10:57:02

place that might be a good place to take a break, I'd like to do so. But if you're in the middle of something, please finish up.

MR. REED: I was going to switch gears, so this would be a good time. 11:03:01

MR. LOW: Okay.

MR. REED: Ten minutes?

MR. LOW: Five is probably good, but if ten -- it's up to you.

MR. REED: We can do five. 11:03:07

MR. LOW: Is that all right with you, Miss Hill -- Mrs. Hill?

THE WITNESS: Yes.

MR. REED: Let's split the difference and go back on at 11:10, since it's a nice round number. 11:03:15

MR. LOW: Perfect. Thank you.

THE VIDEOGRAPHER: We're off the record at 2:03 p.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 2:12 p.m. 11:12:09

Q. BY MR. REED: All right. Miss Hill, do you understand that you are still under oath?

A. Yes.

Q. Okay. For the Walmart photo shoots where did 11:12:30

they take place?
A. At the Walmart photo studio in South San Francisco, California.
Q. And they all took place there?
A. Yes. 11:12:53
Q. And at the time you were living in Los Angeles?
A. Yes.
Q. So you would fly up for each shoot?
A. Yes.
Q. Were they same-day trips typically or overnight? 11:13:03
A. Sometimes I would be asked to work a couple days, more than one day. So sometimes, depending on the booking dates, it could be more than one day.
Q. Okay. So if it was a shoot on a single day, you would fly -- fly up and fly back down the same day, but if it was multiple days then you would stay overnight? 11:13:19
A. Yes.
Q. And for each of the shoots at issue from July 21st, 2016, to August 24th, 2017, who was present? 11:13:37
A. Oh, I don't recall each person's name.
Q. Okay. Do you recall their roles?
A. A photographer, producer, a stylist. That's what I can remember so far. 11:14:22

Q. Okay. And it was consistent for every shoot, though, those were the titles present; photographer, producer, stylist, model?

A. Yes.

Q. At -- at the shoots did anyone identify themselves as a Walmart employee or representative at any point? 11:17:50

A. When you say "identify," you mean --

Q. Introduce themselves or indicate to you that they worked for Walmart or represented Walmart. 11:18:17

A. Yes. I was under the impression that everyone was employed by Walmart, as well as myself.

Q. When you say you were under the impression that -- I'm not talking about you specifically right now, but the other people at the shoots were employed by Walmart, what gave you that impression? 11:18:38

A. They were present in a Walmart photo studio. Who else would have sent them there besides Walmart themselves?

Q. So just their presence alone? 11:19:01

A. Well, yes. And it's a job. People don't show up to a job if that job didn't tell them to be there.

Q. Anything else?

A. No.

Q. Did anyone ever specifically tell you that they 11:19:21

worked for Walmart?

A. Yes.

Q. Who told you that?

A. The stylist, the producer, the photographer.

Q. So each of those -- 11:19:35

A. Anyone present.

Q. They all specifically said that they worked for Walmart, they told you verbally this?

A. Yes.

Q. And was this at each -- was this at one shoot, multiple shoots, all the shoots, when were you told that by these individuals, that they worked for Walmart? 11:20:01

A. I don't recall.

Q. Did it happen more than once?

A. Yes. 11:20:26

Q. Okay. For the photographer role who told you that he or she worked for Walmart?

A. Them themselves.

Q. Okay. Do you know when that happened?

A. I don't recall dates. 11:20:44

Q. Do you know how many times that happened?

A. More than once.

Q. Do you happen to recall what was specifically said?

A. I don't recall. 11:21:01

copied and pasted from a Walmart producer most likely because she's telling Jada to confirm me and Jada is letting me know.

Q. Okay. So this e-mail was sent from Miss Ogden to you to confirm your availability for August 24th and 13:17:55 August 25th; is that correct?

A. Yes.

Q. And that was for a Walmart shoot?

A. Yes.

Q. And then there's a list of items here where it 13:18:14 says, "Call time 8:30; 3 hour minimum; arrive camera ready with makeup and hair down; natural, clear, or no nail polish; a racer back bra and a strapless bra (flesh tone); a thong panty (flesh tone); tattoos covered; make sure feet have a pedicure and any rough heels and edges 13:18:37 are addressed."

What are those items?

A. Those are -- what is the word -- basically rules sent by Walmart of how to arrive.

Q. So those were -- it's just a list of I guess 13:19:02 the parameters for the shoot; is that fair to say?

A. I mean you could say parameters. I look at it as rules because they wouldn't want me to be there if I didn't show up adhering to everything written.

Q. And when it says "3 hour minimum," what did 13:19:35

REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of October, 2020.

Susan I. Stuart

SUSAN I. STUART
California CSR No. 6410, RPR

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
---o0o---

BIJON HILL, an individual,
Plaintiff(s),
vs. No. 4:19-cv-05436-JST
WALMART, INC., a Delaware corporation; and DOES 1-25, inclusive,
Defendant(s).
______________________________/

Videotaped Deposition of

BIJON C. HILL

Volume II

Thursday, October 22, 2020

(This transcript contains Confidential exhibits and testimony pursuant to a Protective Order)

Reported by:
SUSAN I. STUART, CSR No. 6410
Registered Professional Reporter
Job No. SF 4308278

APPEARANCES

(Remotely by Veritext Zoom)

For the Plaintiff:

EXCELSIOR LAW
By: ALYSSA K. SCHABLOSKI, ESQ.
9595 Wilshire Boulevard, Suite 900
Beverly Hills, California 90212
310.205.3981
Alyssa@Excelsior-law.com

For the Defendant:

FORD & HARRISON, LLP
By: TIMOTHY L. REED, ESQ.
1901 Harrison Street, Suite 1650
Oakland, California 94612
415.852.6910
TReed@FordHarrison.com

Also Present:

DANIEL BRUUN, videographer

A. Yes.
Q. Okay. Would -- would anyone else typically be at the shoots?
A. Yes.
Q. Who else would be there?
A. Other models, other producers, other photographers and stylists as well. I wouldn't always be the only model that day.
Q. But you said they would be in sort of -- you need to be in your own separate area doing a separate shoot?
A. Yes, correct.
Q. With your own team?
A. Yes.
Q. And who was responsible for doing makeup and hair?
A. I was, with the stipulations given by Walmart. They told me how to show up, how to wear my hair, how to wear my makeup, if it needed to be changed once I arrived or at anytime during the shoot.
Q. And you testified that the other individuals at these shoots told you that they worked for Walmart; is that correct?
A. Can you specify "other individuals"?
Q. Sure. I believe that last week you testified

Q. Okay.
A. -- with different businesses. And Walmart had their own photo studio in one of those buildings.
Q. Okay. And it was its own dedicated space so Walmart wasn't sharing it with any -- anyone else?
A. Correct.
Q. And you would walk in you said and you would sign in at the reception desk?
A. Yes.
Q. And what did that sign-in process entail?
A. You mean writing down -- just writing down my name, what time --
Q. Yeah.
A. -- I was there, what day it was.
Q. Okay. So you would write down your name, what day it was?
A. Yes.
Q. And then what would happen next?
A. Then I would be escorted into I'd say a dressing room area, which is where they would, you know, tell me -- hand me undergarments that they wanted me to wear and tell me how much time I had to get dressed before I needed to report on set. Cover -- I was told to cover up any tattoos that were visible. Making sure that my nails were the way that they wanted them to be

and just overall that my appearance was the way that they wanted it to be before we started shooting.

Q. Who would escort you back to the dressing room?

A. The receptionist. She was like a receptionist/security person.

Q. Do you happen to recall her name?

A. I do not. I don't.

Q. And apart from the things you just told me, did anything else happen during this time frame after you were first taken back to the dressing room?

A. Just pleasantries, hello's to people, that's all.

Q. And then you were given a time to report for your session?

Is "session" the right word?

A. Yeah.

Well, just -- just to -- a time to report on set so that we could get started shooting. They had a very -- you know, they only had so many hours that they wanted to shoot in between and they wanted, you know, so much done during that time. So timing and starting on time was important to them.

Q. And when you got to the set, what would happen then?

A. I would be given my first outfit or first look

to wear. Or, no, I guess the very first thing we would put -- I would put on what they call grays. You just put on just a gray like tank top and shorts. And it's so that they can take photos and get the lighting right based on your skin tone and what not.

Q. So after this initial part with you being photographed in the grays, what would happen next?

A. Then I would be given my first outfit or first look for the day; shoes, jewelry, undergarments, whatever the outfit was, dress, top, bottoms, swimsuits sometimes. Yeah.

Q. Who would give you the outfits?

A. I believe the stylist.

Q. So after you were given your first look/outfit, what would happen after that?

A. Then we would begin shooting, meaning I would do various poses. Whichever poses that they wanted me to have they would tell me specifically. Stand -- which way to stand, how to -- you know, where to place my hands so I wasn't covering up whatever the main focal point of the product was. I would do front, side, back shots, whatever they would tell me. They would -- I was being directed by the photographer.

Q. So the photographer would be the person telling you which poses to do?

A. Yes, some -- most of the time.

Q. Okay. So you'd take these pictures with your first look, and then what would happen?

A. And then the same thing repeated until we broke for lunch. Just however many looks you could get done. You'd have a whole rack that they wanted you to get done that day. So the name of the game was just however many you could get done and then break for lunch. Or they would break us for lunch, they would tell us when we could go to lunch.

Q. Okay. And who would be the person to decide when it was time to break for lunch?

A. The producer.

Q. Would the producer be -- and you touched on this, but I just want to confirm. Would the producer be just sort of dedicated to your shoot or was the producer moving in and out of other shoots as well?

A. It was to my knowledge that they were kind of floating around.

Q. And when you broke for lunch, how long was that typically?

A. I don't remember exactly, but between 30 minutes, an hour.

Q. And who would decide when the lunch break was over?

A. Not that I can remember.
Q. Were there ever any occasions where you got through the rack early and you were able to leave early?
A. Not that I can remember.
Q. After the shoot ended, what would happen next?
A. After the shoot ended, I would, you know, change back into my clothes, hand them back their clothes, or whatever they asked me, you know, to wear that day, and then I would go into the producer's office to where I would sign a voucher that she had, you know, drawn up or typed up.
Q. You would sign the voucher and then what would happen after that?
A. And then I would typically just call my Uber back to either the airport or to the hotel if I was shooting more than one day.
Q. Going back to the airport did you seek reimbursement in the same way you previously described for your trips from the airport to the studio?
A. Well, yes. I would, you know -- it would only make sense to get reimbursed for both rides versus one.
Q. And what about instances where you stayed overnight, would you get reimbursed or seek reimbursement for your Uber from the studio back to your hotel?

Q. Okay. The ten dates at issue from July 16th -- I'm sorry, from July 2016 to August 2017 we've talked about variation and sort of the team that was involved and the clothing you wore.

But apart from that, do you remember any specific ways in which the day unfolded differently than what you described?

A. I mean some days I was asked to shoot lingerie, so that would probably be the only difference.

Q. When the -- when shoots concluded, would the photographer let the producer know or was there another way in which it was decided that the day was going to end?

A. No. Like I said previously, there was typically a time -- an end time that everyone knew about.

Q. Apart from deciding when to start the day, when to break for lunch, when to come back, when to end the day, did the producer have any other involvement in the shoot?

A. I mean the producer was the main overseer, so she would float around. And if she saw something she wanted changed, if she wanted me to do a different pose, she would tell me. If she wanted me to change my hair, she would tell me. If she wanted me to change my

makeup, she would tell me. If she wanted me to change my nail color, she would tell me. I mean she was pretty much in control of the entire shoot day.

Q. And when you say "she would float around," does that mean she would just -- she would be moving in between the different shoots?

A. Yeah. We call them bays. There are different bays set up, so she would move from different bays or different sets.

Q. Pardon the delay. I'm introducing an exhibit. It's taking a second.

Alyssa, you have the Exhibit Share link; right?

MS. SCHABLOSKI: Let me take a look.

MR. REED: Because I think it's based on -- I think we have to send it to specific e-mail addresses.

MS. SCHABLOSKI: Oh, then I don't know if I do or not.

MR. REED: Okay. Let's --

MS. SCHABLOSKI: Is it in the Veritext e-mail?

MR. REED: I don't -- it's -- it's a different one for --

Let's go off the record for a second. Is that okay, Alyssa?

MS. SCHABLOSKI: Sure.

THE VIDEOGRAPHER: One moment. We are off the

MR. REED: Miss Hill already -- I'm sorry, go ahead, Alyssa. I didn't mean to cut you off.

MS. SCHABLOSKI: No. That's all right.

It may call for a legal conclusion.

Q. BY MR. REED: You can answer, Miss Hill, unless your attorney instructs you not to answer.

A. I mean I -- I mean correct me if I'm wrong, but it sounds like you're asking me to sum up yet again that I was being paid to perform -- to give them the images that they wanted each day, and -- and we've -- I've said yes to that before.

Q. And also for them to use the images; right?

A. Well, they're -- there's no point in them paying me if they couldn't use the images.

Q. And if you look at the bottom paragraph, it says, "I agree to submit this Voucher at the end of each day modeling services rendered" -- "are rendered," pardon me, "but in any event no later than seven days after any date by which my modeling services are rendered, and that any changes to the rate described above must be pre-approved in writing by Walmart. All payments are due in thirty days from date of invoice submission. Model" -- "model will receive payment based on payment from Walmart, unless otherwise negotiated by the agency."

MS. SCHABLOSKI: I'll object to the extent it calls for a legal conclusion and it's a contention question in a deposition. I believe it's also been asked and answered. But --

MR. REED: Hasn't been asked.

Q. BY MR. REED: You can answer it unless you're instructed not to answer it, Miss Hill.

A. Yeah, I believe we've covered this quite a couple times. And I was not in control of pretty much anything when it came to the shoots. They told me how to wear my hair, how to wear my makeup, how to wear my nails, what to pose, how to pose, when to show up, when to leave, when I was allowed to break for lunch. I had to let them know when I was going to the bathroom. I mean I believe we've gone over this, though.

Q. Anything else? Just making sure we're covering everything.

A. They were in full control when it came to me being at the shoots.

Q. Okay. So once you arrived at the studio for the shoots, Walmart kind of controlled how your -- how your day went --

A. Yes.

Q. -- is that correct?

A. Correct.

REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of October, 2020.

SUSAN I. STUART
California CSR No. 6410, RPR